IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ETHEL THOMAS WOOD, Executor of      )
the Estate of James Waverly         )
Wood, deceased,                     )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      1:14cv1004
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Defendant.              )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

     This is an action by Plaintiff, Ethel Thomas Wood, as Executor of the estate of her deceased husband, James Waverly Wood, alleging negligence and premises liability against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, et seq. ("FTCA"), following Mr. Wood's surgery and subsequent death at a Veterans Affairs ("VA") facility. The United States now moves for summary judgment on four grounds: (1) Plaintiff did not provide notice of her current theories to the administrative agency as required by the FTCA; (2) res ipsa loquitur is inapplicable; (3) there are no genuine issues of material fact as to the United States' lack of ordinary negligence; and (4) Plaintiff's negligence claim sounds in medical malpractice but her complaint lacks the expert certification required by North Carolina law. (Docs. 30, 31.) For the reasons set forth below, the United

States' motion will be granted as follows: Plaintiff's premises liability and ordinary negligence claims will be dismissed, but because Plaintiff's negligence claim would properly sound, if at all, in medical malpractice yet was properly exhausted, it will be dismissed without prejudice.

## I.    BACKGROUND

On August 9, 2012, Mr. Wood was admitted to the Durham Veterans Affairs Medical Center ("Durham VA") for four-vessel coronary artery bypass graft surgery, commonly known as a quadruple bypass.[1]  The anesthesia team caring for Mr. Wood was led by Dr. Christy Crockett, a fourth-year resident in her cardiac anesthesia rotation, and Dr. Jonathan Mark, the attending anesthesiologist. (Doc. 31-9 at 2.)

To ensure the delivery of certain medications during surgery, Dr. Crockett placed a central line, also known as a "multi-lumen access catheter," into Mr. Wood's internal jugular vein. (Doc. 32-2; Doc. 35-4; Doc. 35-5 at 2-3.)  Dr. Crockett secured the central line to Mr. Wood's neck with sutures and an occlusive dressing and verified its correct placement by ultrasound. (Doc. 32-2; Doc. 32-3 at 4.)

When Mr. Wood's quadruple bypass was completed, the

---

[1] Mr. Wood suffered from multiple ailments, including end-stage renal disease (kidney failure), peripheral vascular disease that led to the amputation of both legs, colon cancer, and diabetes. (Docs. 31-3, 31-4, and 31-5.)

2

anesthesiology team was tasked with transferring him from the operating room ("OR") table to a transport bed. (Doc. 31-10 at 2-3.) Mr. Wood was connected to a multitude of medical devices, which had to be "disconnected or otherwise moved with [Mr. Wood] as he [was] transferred from the operating room table to the intensive care transport bed." (Doc. 32-1 at 3.) At approximately 2:15 p.m., Dr. Crockett and Dr. Mark began the process of disconnecting devices that were not needed for transport and connecting devices that were required for transport to the transport monitor. (Id. at 3-4.) They then spent several minutes tracing all of the various lines and tubes to make sure they were free and clear and had enough slack to be able to move Mr. Wood from the OR table to the transport table. (Id.) This process took approximately seven minutes and concluded at 2:22 p.m. (Id. at 4.)

At approximately 2:22 p.m., the team moved Mr. Wood to the transport bed using a roller board. (Id. at 5.) At least five individuals assisted with the move: Dr. Crockett, Dr. Mark, a physician's assistant, and two OR nurses. (Doc. 31-10 at 5.) Dr. Crockett led the move and was located at Mr. Wood's head. (Id.) "Just before the move," Dr. Crockett says she performed a final check to ensure that all lines that needed to make the transfer with Mr. Wood were free and clear. (Id.) In order to control the medication lines during transfer, it was Dr. Crockett's practice

3

to tape them together and either hold them in her hand or drape them over her arm. (Id.) With the taped lines embraced between her arm and Mr. Wood's head, Dr. Crockett counted to three and initiated the move. (Id.) However, as the team moved Mr. Wood from the OR table to the transport bed, Dr. Crockett felt a tug. (Id.) She then saw that Mr. Wood's central line had come out of his neck during the move. (Id.) Although she cannot be sure, Dr. Crockett believes that this may have happened when one of the multiple medication lines leading from the transfusion pumps to Mr. Wood's central line "got caught on either the padding on the OR bed or the side of the table itself." (Id.)

Dr. Crockett says she restored the flow of medication to Mr. Wood within seconds through a peripheral IV, yet Mr. Wood nearly simultaneously developed severe hypotension (abnormally low blood pressure). (Id. at 6.) The team responded by administering large doses of epinephrine, and the surgeon reopened Mr. Wood's chest and initiated open cardiac massage. (Id.) Mr. Wood was moved to a separate room and died fourteen days later on August 23, 2012.

Following Mr. Wood's death, Plaintiff filed a Standard Form 95 ("SF-95") with the VA. (Doc. 31-2.) She alleged that the disconnection of her husband's central line during the transfer described above proximately caused his death. (Id. at 4.) She further alleged that the caregivers "violated the applicable standard of care by failing to properly connect and/or secure Mr.

4

Wood's internal jugular line." (Id. at 5.) The VA subsequently denied Plaintiff's claim, and thereafter she filed this action in federal court under the FTCA.

Plaintiff's initial complaint incorporated the factual allegations stated in her SF-95 filing. (Doc. 1.) Count one alleged "Medical Malpractice," while count two alleged premises liability. (Id. at 5-6.) Pursuant to North Carolina Rule of Civil Procedure 9(j), N.C. Gen. Stat. § 1A-1, Rule 9(j), her complaint contained a certificate that the medical care had been reviewed by a person who is reasonably expected to qualify as an expert witness and who is willing to testify that the medical care did not comply with the applicable standard of care. (Id. at 6.) After the completion of discover, however, Plaintiff moved to amend her complaint. (Doc. 23 at 1.) She contended discovery had revealed that transferring Mr. Wood was a predominantly physical or manual activity that did not constitute a professional health care service as required for a medical malpractice action and therefore sought amendment to proceed under a theory of ordinary negligence. (Id. at 2-4.) The United States did not object, and the court provided leave to amend. (Doc. 26.) Thereafter, Ms. Wood filed the current amended complaint, which relies on ordinary negligence, res ipsa loquitur, and premises liability. (Doc. 27.) Unlike the first complaint, the amended complaint does not contain a Rule 9(j) expert certification. (Id. at 7.) The United States now moves

5

for summary judgment on the grounds set forth above.

## II. ANALYSIS

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The court is not permitted to weigh the evidence, assess credibility, or resolve issues of fact. Id. at 255.

### A. Administrative Presentation

The United States argues that Plaintiff failed to adequately present her current claims of ordinary negligence and premises liability to the administrative agency, a prerequisite to filing a lawsuit. (Doc. 31 at 19-20.) Plaintiff responds that her current theories were adequately presented because they are based on the same operative facts as those contained in her SF-95. (Doc. 35 at 17-18.) The court agrees.

The United States enjoys sovereign immunity from suits for damages at common law. Perkins v. United States, 55 F.3d 910, 913

(4th Cir. 1995).  The FTCA constitutes a limited waiver of this immunity.  Id.  Nevertheless, prior to proceeding with FTCA claims in federal court, a plaintiff must first have presented her claim to the appropriate federal agency for determination within two years of the claim's accrual.  Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994).

A claim is properly presented where it contains: "1) written notice sufficient to cause the agency to investigate, and 2) a sum-certain value on the claim."  Id. at 517 (citing Adkins v. United States, 896 F.2d 1324, 1326 (11th Cir. 1990)).  A notice is sufficient to cause investigation where the factual predicate permits an agency to "either reasonably assess its liability or competently defend itself."  Drew v. United States, 217 F.3d 193, 197 (4th Cir. 2000), reh'g en banc granted, opinion vacated, aff'd by equally divided court without opinion, 231 F.3d 927 (4th Cir. 2000); Richland-Lexington Airport Dist. v. Atlas Props., Inc., 854 F. Supp. 400, 412 (D.S.C. 1994) ("[N]otice must be sufficiently detailed so that the United States can 'evaluate its exposure as far as liability is concerned.'") (citation omitted)).  Moreover, "a claimant need not give the government notice of every possible theory of recovery."  Degenhard v. United States, No. 5:13cv685, 2015 WL 632211, at *1 (E.D.N.C. Feb. 13, 2015); Nelson v. United States, 541 F. Supp. 816, 818 (M.D.N.C. 1982).

Plaintiff's SF-95 adequately presented her ordinary

negligence claim. Although the SF-95 is styled as a medical malpractice claim and the amended complaint relies on ordinary negligence, both assert the same operative facts giving rise to injury and liability: namely, that VA agents failed to ensure that Mr. Wood's central line stayed intact during his transfer from the OR table to the transport table. (Compare Doc. 31-2, with Doc. 27.)

Under North Carolina law, medical malpractice claims and ordinary negligence claims are governed by different standards of care; the former requires a plaintiff to prove a violation of the applicable medical standard of care, see N.C. Gen. Stat. § 90-21.12(a), and the latter refers to the familiar reasonable person standard, e.g., McDonald v. Moore Sheet Metal & Heating Co., 268 N.C. 496, 502, 151 S.E.2d 27, 32 (1996). The defining distinction between medical malpractice claims and ordinary negligence claims, however, is that medical malpractice claims "aris[e] out of the furnishing or the failure to furnish professional [health care] services," N.C. Gen. Stat. § 90-21.12(b), whereas ordinary negligence claims do not, see Goodman v. Living Ctrs.-Se., Inc., 234 N.C. App. 330, 332-34, 759 S.E.2d 676, 678-80 (2014). The North Carolina Court of Appeals has defined "'professional services' as an act or service 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor [or] skill involved is predominately mental

8

or intellectual, rather than physical or manual.'" Id. at 332, 759 S.E.2d at 678 (alteration in original). Courts are frequently asked to classify claims as medical malpractice or ordinary negligence claims based on whether the injury arose from the provision of professional health care services. See, e.g., Littlepaige v. United States, 528 F. App'x 289, 293-94 (4th Cir. 2013) (unpublished) (finding that claim alleged in terms of ordinary negligence sounded in medical malpractice); Lewis v. Setty, 130 N.C. App. 606, 608, 503 S.E.2d 673, 674 (1998) ("[R]emoval of the plaintiff from the examination table to the wheelchair did not involve an occupation involving specialized knowledge or skill, as it was predominantly a physical or manual activity."); Norris v. Rowan Mem'l Hosp., Inc., 21 N.C. App. 623, 626, 205 S.E.2d 345, 348 (1974) (finding "the alleged breach of duty did not involve the rendering or failure to render professional nursing or medical services requiring special skills"). Thus, operative facts — not labels — put parties on notice of whether they are facing a claim for medical malpractice or for ordinary negligence. Any trained legal reader would be aware that the SF-95 could state a claim under either theory, depending on whether or not Mr. Wood's transfer from the OR table to the transport table involved the provision of professional health care services. This was sufficient to permit the agency to assess its liability and investigate the claim.

9

The United States relies on <u>Degenhard v. United States</u>, No. 5:13cv685, 2015 WL 632211 (E.D.N.C. Feb. 13, 2015), to the contrary, but that case is distinguishable. There, the plaintiffs asserted a claim administratively for wrongful death. <u>Id.</u> at *2. Following denial of the claim, the plaintiffs brought suit in federal district court alleging claims for wrongful death and negligent infliction of emotional distress ("NIED"). <u>Id.</u> The court held that the wrongful death claim asserted administratively did not provide adequate notice of the NIED claim because the plaintiffs' two claims "involve[d] different facts." <u>Id.</u> at *4. Namely, the newly asserted NIED claim required a showing of "severe emotional distress," whereas the wrongful death claim did not. <u>Id.</u> Therefore, the wrongful death claim did not put the agency on notice of the need to investigate whether the plaintiffs had suffered severe emotional distress. <u>Id.</u>

Here, there are no additional facts that would have required investigation if the agency had viewed the SF-95 as sounding in ordinary negligence as opposed to medical malpractice. Both claims involve determining what happened in transferring Mr. Wood from the OR table and why he died. To the extent the agency believed the action sounded in medical malpractice, it needed to assess whether the applicable medical standard of care had been met. Evaluation of liability for ordinary negligence under the reasonable person standard would have required no additional

10

investigation, and arguably less. Knowing the operative facts, the agency would simply have determined whether a reasonable person in the same or similar circumstances would have acted in accordance with the caregivers.

The SF-95 also provided sufficient notice of Plaintiff's premises liability claim. The premises liability claim is based on a property owner's "duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors." Nelson v. Freeland, 349 N.C. 615, 632, 507 S.E.2d 882, 892 (1998). The SF-95 alleged that the caregivers "fail[ed] to provide a safe environment/premises for the transfer to take place." (Doc. 31-2 at 5.) This was sufficient to alert the agency to the need to investigate whether maintenance of the premises played any role in the alleged injury.

Accordingly, the SF-95 provided sufficient notice of the claims presented in the amended complaint, and the United States' motion for summary judgment on this ground will be denied.

**B. Premises Liability**

"A plaintiff has an FTCA cause of action against the government only if she would also have a cause of action under state law against a private person in like circumstances." Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991). Therefore, the substantive law of each state establishes the cause of action. Kerns v. United States, 585 F.3d 187, 194 (4th Cir. 2009). Here

11

that is the substantive law of North Carolina.

Plaintiff's amended complaint asserts premises liability based on Defendant's alleged failure to implement adequate safety procedures. (Doc. 27 at 7-8.) Defendant's opening brief asserted that no evidence exists to support this claim. (Doc. 31 at 17.) Plaintiff's response fails to direct this court to any evidence to the contrary (see Doc. 35), and this court is not aware of any. The law requires some evidence that the property owner failed to exercise reasonable care in the maintenance of its premises. Nelson, 349 N.C. at 632, 507 S.E.2d at 892. But here all evidence is directed at the treatment of the patient and not at the maintenance of the VA facility. Accordingly, the United States' motion for summary judgment on this claim will be granted.

### C. Negligence Claim

The court must next determine whether Plaintiff's negligence claim sounds in medical malpractice or ordinary negligence. The United States contends that Plaintiff's negligence claim sounds in medical malpractice because Mr. Wood's transfer resulted from the provision of professional health care services. (Doc. 31 at 9; Doc. 37 at 6-8.) Plaintiff maintains that the claim sounds in ordinary negligence because Mr. Wood's transfer was a predominantly physical or manual activity. (Doc. 35 at 14-16.) For the reasons that follow, the court agrees with the United States.

12

Claims sounding in medical malpractice must comply with North Carolina Rule of Civil Procedure 9(j), which requires the aforementioned certification that, following reasonable inquiry, a person anticipated to qualify as an expert under North Carolina Rule 702 is willing to testify that the medical care did not comply with the applicable standard of care. N.C. Gen. Stat. § 1A-1, Rule 9(j). Of course, claims sounding in ordinary negligence have no such requirement. Goodman, 234 N.C. App. at 332, 759 S.E.2d at 678. Rule 9(j) provides that, unless res ipsa loquitor applies, a claim sounding in medical malpractice that lacks a certification of expert testimony "shall be dismissed." Id. Whether a plaintiff must comply with Rule 9(j) is a question of law. Allen v. Cty. of Granville, 203 N.C. App. 365, 366, 691 S.E.2d 124, 126 (2010).

Plaintiff's negligence claim sounds in medical malpractice if it arose from "the furnishing or failure to furnish professional [health care] services." N.C. Gen. Stat. § 90-21.11(2). The North Carolina Court of Appeals has defined "'professional services' as an act or service 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor [or] skill involved is predominantly mental or intellectual, rather than physical or manual.'" Goodman, 234 N.C. App. at 332, 759 S.E.2d at 678 (alteration in original). In an unpublished decision, the Fourth Circuit has also considered whether resolving the issue of liability would require the

resolution of "issues related to standards of medical care and . . . medical judgment." Littlepaige, 528 F. App'x at 294 (unpublished).[2]

Plaintiff contends that the labor or skill involved in transferring Mr. Wood from the OR table was predominantly physical or manual. She relies upon a series of North Carolina Court of Appeals decisions. (Doc. 35 at 15.) The analysis in each decision is highly fact specific, and no case quite fits the situation before this court. See Goodman, 234 N.C. App. at 334, 759 S.E.2d at 680 (finding failure to safely position an IV apparatus near decedent's bed, causing it to fall on decedent, involved "the exercise of manual dexterity as opposed to the rendering of any specialized knowledge or skill"); Norris, 21 N.C. App. at 626, 205 S.E.2d at 348 (finding failure to raise bed rails or instruct the patient to request assistance in getting out of bed did not constitute the rendering of professional health care services).

The most analogous case relied on by Plaintiff is Lewis v. Setty, 130 N.C. App. 606, 503 S.E.2d 673 (1998). There, a quadriplegic man visited his doctor as a result of chest pains. Id. at 607, 503 S.E.2d at 673. Although the examination table had

---

[2] The Fourth Circuit has cautioned that its unpublished opinions have no precedential value but are nevertheless valuable for their persuasive reasoning. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (recognizing that "we ordinarily do not accord precedential value to our unpublished decisions" and that such decisions "are entitled only to the weight they generate by the persuasiveness of their reasoning" (citation omitted)).

14

a lever to raise or lower it, the doctor and an assistant did not use it when moving the plaintiff from his wheelchair, and when they attempted to return the plaintiff from the examination table to his wheelchair, they heard a loud "pop" as his right hip fractured. Id. The court found that "the removal of the plaintiff from the examination table to the wheelchair did not involve an occupation involving specialized knowledge or skill, as it was predominantly a physical or manual activity." Id. at 608, 503 S.E.2d at 674.

If Mr. Wood's injury resulted simply from his transfer to the OR table, as in Lewis, then this case would be more like it. But this case involves much more than physical movement. At the end of Mr. Wood's surgery, he was connected to an array of medical devices, including "several medication infusion pumps, monitoring devices/anesthesia monitors, and a ventilator by multiple intravascular (IV) lines/central line, wires, and a ventilating circuit and endotracheal tube (ETT)." (Doc. 31-10 at 3.) To safely conduct a transfer, "[e]ach of the wires connecting the patient to the anesthesia monitors in the OR needs to be disconnected from their accompanying monitoring device so that they can be reconnected to the transport monitor which is located on the transport bed for transport." (Id.) "[C]hest tubes/drains, pacemaker, foley catheter, pressure transducers, and infusion bags" are also connected and must move with the patient, all while

15

the patient remains "connected to the various medication infusion pumps via the central line or IV lines." (Id.)

Plaintiff's allegation that Defendant's agents "fail[ed] to use reasonable care to monitor Mr. Wood's central line during the transfer in order to be aware that the central line was at risk to be 'pulled out,'" (Doc. 27 at 6 (emphasis added)), must be evaluated in light of the undisputed complexity of the environment in which the transfer and monitoring took place. (Doc. 32-12 at 4 (describing the interaction of various medical devices in the OR as "spaghetti syndrome").) For example, in addition to keeping the assemblage of medical lines free and clear during transfer, it was Dr. Crockett's "personal responsibility . . . to insure that the endotracheal tube [was] secured." (Doc. 35-2 at 2-3.) The endotracheal tube is critical to patient breathing and must be reconnected to a breathing apparatus after transfer. (Id. at 2-5.) Managing this complexity and prioritizing tasks, all necessary for a safe transfer, requires an understanding of the purpose and interaction of the various medical devices such that the required skill and knowledge is predominantly mental or intellectual. (Id.; Doc. 31-10 at 3-6.) It is undisputed that non-medical personnel are not involved in such transfers, especially in the role that Dr. Crockett served. (Doc. 32-8 at 7.) That the transfer also requires the physical or manual skills of moving the patient's body is not determinative, because these skills do not

16

predominate.[3]

Plaintiff's expert, Dr. Michael Simon, urges a different result. (Doc. 35-8 at 3-4.) Although he does not challenge Dr. Crockett's account of the multitude of medical devices that must be managed during a transfer, Dr. Simon contends the dislodgment of Mr. Wood's central line would have been avoided if Dr. Crockett had "applie[d] constant visualization of the medication line or constant tactile contact near the insertion site of the line." (Id.) Seeing and feeling the medication line in these circumstances, he contends, are ordinary physical actions. (Id. at 4.) But interestingly, rather than contend that a reasonable person would have maintained visual or tactical control, Dr. Simon asserts that Dr. Crockett's purported failure to do so violated the applicable medical standard of care. (Doc. 35-9 at 7; Doc. 35

---

[3] Dr. Mark, the supervising anesthesiologist, testified as follows about the skills involved in the transfer: "The technical skills are not very advanced. I think I could take a competent, instructable [sic] person who has virtually no technical medical knowledge and, by supervising them, have them conduct the technical aspects of moving a patient, at the head of the bed, safely." (Doc. 35-5 at 5.) His testimony is of limited value for several reasons. First, he is a fact witness in this case. Second, his opinion presupposes that the skill can be mastered with his supervision, which would likely involve the conveyance of his medical knowledge. Third, and most importantly, his opinion too narrowly construes the task at hand. Even though the transfer itself requires the management of multiple medical instruments, much of the task of executing a safe transfer is in the preparation, which involves knowledge of how the systems function. This is illustrated by the seven minutes of line tracing and preparation Dr. Crockett and Dr. Mark purportedly engaged in. (Doc. 32-1 at 3-4.) In fact, Plaintiff asserts that something could have gone wrong during the preparation for transfer. (Doc. 35 at 17 (contending that Dr. Crockett "may not have been as attentive as she thought" in checking to make sure the medication line was clear to come over with the patient).)

17

at 5-6.)  It is clear from both Dr. Simon's testimony and Plaintiff's briefing that the standard of care Dr. Simon seeks to impose is derived from his extensive medical experience as a cardiac anesthesiologist.  (Doc. 35 at 5-6 ("Based upon his long experience, Dr. Simon has stated . . . that the critical elements of accomplishing a safe transfer are continuous visualization of the medication line and/or continuous tactical contact with the medication line at the insertion site.").)  It is not based upon what a reasonable ordinary person would know because, for the reasons outlined above, such a person would know little, if anything, about the intricacies of a transfer under the circumstances.  Therefore, similar to the reasoning of the Fourth Circuit in Littlepaige, the fact that evaluating liability for the transfer will require the resolution of "issues related to standards of medical care" further supports the conclusion that this action sounds in medical malpractice.  528 F. App'x at 294.

Having reached this conclusion and because Plaintiff failed to provide a Rule 9(j) certification, the court must address whether Plaintiff's medical malpractice claim can nevertheless survive under the doctrine of res ipsa loquitur.

### D.  **Res Ipsa Loquitur**

The United States contends that Plaintiff cannot rely on res ipsa loquitur because central line dislodgment occurs in the absence of negligence.  (Doc. 31 at 13-16; Doc. 37 at 4-6.)

Plaintiff responds that central line dislodgment was not an inherent risk of Mr. Wood's procedure. (Doc. 35 at 5-8.) For the reasons that follow, the court finds that res ipsa loquitur is inapplicable.

The doctrine of res ipsa loquitur is "addressed to those situations where the facts or circumstances accompanying an injury by their very nature raise a presumption of negligence on the part of [the] defendant." Robinson v. Duke Univ. Health Sys., 229 N.C. App. 215, 224, 747 S.E.2d 321, 329 (2013) (alteration in original) (quoting Bowlin v. Duke Univ., 108 N.C. App. 145, 149, 423 S.E.2d 320, 322 (1992)). The doctrine only applies "when (1) direct proof of the cause of an injury is not available, (2) the instrumentality involved in the accident [was] under the defendant's control, and (3) the injury is of a type that does not ordinarily occur in the absence of some negligent act or omission." Id. (alteration in original) (quoting Alston v. Granville Health Servs., 221 N.C. App. 416, 419, 727 S.E.2d 877, 879 (2012)).

The doctrine rarely applies in medical malpractice actions. See Wright v. United States, 280 F. Supp. 2d 472, 481 (M.D.N.C. 2003). This is due in part to the centrality of expert testimony in most medical malpractice actions. Robinson, 229 N.C App. at 224-25, 747 S.E.2d at 329. Expert testimony permits the jury to understand issues beyond common knowledge, whereas res ipsa loquitur is limited to those situations where the common knowledge

19

of laypersons is sufficient. _Wright_, 280 F. Supp. at 481. Accordingly, in recognition of the conflict between expert testimony and the "common knowledge" groundings of _res ipsa loquitur_, a plaintiff must be able to show, "without the assistance of expert testimony — that the injury was of a type not typically occurring in the absence of some negligence by defendant." _Robinson_, 229 N.C. App. at 225, 747 S.E.2d at 329 (emphasis added). This requirement ensures that _res ipsa loquitur_ is not applied in medical malpractice claims beyond those situations where "a physician's conduct is so grossly negligent or treatment is of such nature that the common knowledge of laypersons is sufficient to find [the essential elements]." _Wright_, 280 F. Supp. 2d at 481 (alteration in original); _Hayes v. Peters_, 184 N.C. App. 285, 287-88, 645 S.E.2d 846, 848 (2007) ("In order for the doctrine to apply, an average juror must be able to infer, through his common knowledge and experience and without the assistance of expert testimony, whether negligence occurred."); _Grigg v. Lester_, 102 N.C. App. 332, 335, 401 S.E.2d 657, 659 (1991) ("The common knowledge, experience and sense of laymen qualifies them to conclude that some medical injuries are not likely to occur if proper care and skill is used; included, _inter alia_, are injuries resulting from surgical instruments or other foreign objects left in the body following surgery and injuries to a part of the patient's anatomy outside of the surgical field.").

20

The United States has presented evidence that central line dislodgment is an inherent risk of transfer that ordinarily occurs in the absence of negligence.[4] (Doc. 31 at 8-9 (summarizing evidence); Doc. 32-8 at 7-8; Doc. 32-12 at 5-6.) To counter this evidence, Plaintiff relies on Dr. Simon, who testified that he has "never seen a case where the patient's central line was pulled out during transfer or otherwise" in his seventeen years of doing exclusively cardiac surgery. (Doc. 35-8 at 3.) In his view, dislodgment "would likely only occur" if the anesthesia provider fails to maintain visual and/or tactical control of the medication line. (Id.) Dr. Simon did testify, however, that he has witnessed medication lines, other than central lines, come out during transfers and that he would not attribute these dislodgments to negligence. (Id.; Doc. 32-4 at 5-7.) In fact, when asked, "If you learn that a line is unintentionally pulled out, are you saying that's automatically a negligent situation or do you need more information?," Dr. Simon responded that he would "need more information." (Doc. 32-4 at 8.) In any case, Plaintiff cannot rely on the expert testimony of Dr. Simon to establish that central line dislodgment "does not ordinarily occur in the absence of negligence." Robinson, 229 N.C. App. at 225, 474 S.E.2d at 329.

---

[4] Because it does not affect the conclusion, the court assumes, as do the parties, without deciding that the "injury" is the central line dislodgment and not Mr. Wood's cardiogenic shock, total body anoxia, and multiple system damage and subsequent death, which the amended complaint asserts as injury. (Doc. 27 ¶ 29.)

This is not the rare medical malpractice case where a layperson's common knowledge is sufficient to understand that negligence occurred. C.f., id. at 230, 474 S.E.2d at 332 (finding that lay knowledge and experience was sufficient to understand that surgical connection of the patient's anus to her vagina was the product of negligence). As noted above, Mr. Wood's central line was dislodged while being moved in a complex medical environment. (Doc. 35-2 at 2-5; Doc. 31-10 at 3-6.) Unlike anesthesiologist professionals, whose experience and training permits them to understand the interaction and significance of various medical devices, a layperson could not appreciate this complexity without the assistance of expert testimony. Because a layperson would need more than his common knowledge and experience to infer negligence, res ipsa loquitur is inapplicable and the United States' motion for summary judgment as to count one will be granted.

## III. CONCLUSION

For the reasons stated,

IT IS ORDERED that the United States' motion for summary judgment (Doc. 30) is GRANTED as follows:

1. The United States is entitled to summary judgment on count two alleging premises liability, which is DISMISSED WITH PREJUDICE.

2.   The United States is entitled to summary judgment on count one alleging ordinary negligence, because the FTCA claim can only proceed, if at all, as a medical malpractice claim to which res ipsa loquitur does not apply, but for which there is presently no expert certification under N.C. Gen. Stat. § 1A-1, Rule 9(j). However, because Plaintiff's claims were adequately presented in her SF-95 and Plaintiff's initial complaint (which was previously withdrawn) contained a Rule 9(j) certification, count one will be DISMISSED WITHOUT PREJUDICE in the event it is susceptible to being refiled as a properly pleaded medical malpractice claim.  Pursuant to North Carolina Rule of Civil Procedure 41(b), a new action in compliance with North Carolina Rule of Civil Procedure 9(j) based on the medical malpractice claim may be commenced within one year or less of this dismissal.[5]

                                      /s/   Thomas D. Schroeder
                                      United States District Judge
July 21, 2016

---

[5] While the court applies the saving provision of Rule 41(b), no opinion is expressed on the effect of North Carolina's statute of repose on any claim Plaintiff may refile.  See N.C. Gen. Stat. § 1-15(c) ("[I]n no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action.").  Because the four-year period may be quickly approaching (see Doc. 27 at 2 (alleging that any negligence from the dislodgment of Mr. Wood's central line occurred on August 9, 2012)), however, Plaintiff is cautioned to heed its potential impending deadline.